IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-00775-PAB-STV

PSO-RITE.COM LLC, a Delaware limited liability company,

      Plaintiff,

v.

THRIVAL LLC, a Colorado limited liability company,
CAMERON SMITH, an individual,
DOMINIC RAINVILLE, an individual, and
WILLIAM SMITH, an individual,

      Defendants,

v.

MACKENZIE MOLLOHAN,

      Counter-Defendant.

---

## ORDER

---

The matter before the Court is the parties' Joint Motion for Determination of Claim Construction [Docket No. 117], wherein the parties ask the Court to construe various claim terms[1] in defendant and counterclaimant Thrival LLC's United States Patent No. 9,687,416 ("the '416 Patent"). On January 21, 2025, the Court held a claim construction hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). Docket No. 128.

---

[1] As discussed below, defendants ask the Court to construe seven claim terms. Docket No. 113 at 2–11. Plaintiff maintains that only three of the seven claim terms require construction. *Id.*

## I.    BACKGROUND

Plaintiff Pso-Rite.com LLC filed this action on March 16, 2021.  Docket No. 1.  On

October 28, 2022, defendants Cameron Smith, Dominic Rainville, William Smith, and

Thrival LLC (collectively "Thrival") filed their answer to Pso-Rite.com LLC's complaint.

Docket No. 55.  In addition to its answer, Thrival filed nine counterclaims against Pso-

Rite LLC and one of Pso-Rite.com LLC's founders, Mackenzie Mollohan (collectively

"Pso-Rite").  *Id.* at 23, 37–53, ¶¶ 4, 64–138.  Thrival's first counterclaim is for

infringement of the '416 Patent.  *Id.* at 37–39, ¶¶ 64–73.

The '416 Patent is a utility patent[2] "directed to a neuromuscular therapy device."

U.S. Patent No. 9,687,416 col. 1, ll. 41–42.  Claim 1 of the '416 Patent describes:

> 1. A neuromuscular therapy device, comprising:
> a top unit comprising a pair of **square pyramidal bodies** separated by a
>    central valley, wherein each of the pair of square pyramidal bodies
>    comprises **a top peak with vertices that are smoothly radiused**; and
> a base unit comprising **a recessed platform**, wherein the recessed
>    platform corresponds and is configured to receive an entire bottom
>    perimeter of the top unit.

*Id.* col. 7, ll. 5–12 (emphasis added) (claim terms at issue in this order appear in

bold).  Dependent claims 3 and 12 state that the "top unit" of the "neuromuscular

therapy device" is "made of a **thermoplastic elastomer**."  *Id.* col. 7, ll. 15–16;

col. 8, ll. 29–30.

Independent claim 8 of the '416 Patent describes:

> 8. A method of neuromuscular therapy, the method comprising:
> placing a neuromuscular therapy device against a flat surface, the
>    neuromuscular therapy device comprising a pair of **square pyramidal
>    bodies** separated by a central valley, wherein each of the pair of **square
>    pyramidal bodies** comprises **a top peak with vertices that are
>    smoothly radiused**;
> positioning a user on the neuromuscular therapy device to exert pressure
>    against a therapeutic anatomical target of the user; and

---

[2] The '416 Patent includes claims for both a device and a method.  *See* '416
Patent col. 7 ll. 5, 33.

2

disposing the neuromuscular therapy device onto **a recessed platform** of a base unit,

wherein the recessed platform corresponds and is configured to receive an entire bottom perimeter of the neuromuscular therapy device, and wherein the therapeutic anatomical target comprises at least one of the **erector spinae group**, **multifidus and short posterior sacroiliac ligaments** and associated trigger points.

*Id.* cols. 7–8, ll. 33–9.

## II.   LEGAL STANDARDS FOR PATENT CLAIM CONSTRUCTION

Claim construction is a question of law for the court, *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015), guided by Federal Circuit precedent.  *See SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1333 (Fed. Cir. 1999).  The Federal Circuit has made clear that "there is no magic formula or catechism for conducting claim construction."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc).  Several key sources and doctrines should be consulted and applied, but "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.*

The starting point is the "bedrock principle" that "'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The words of the claims "'are generally given their ordinary and customary meaning,'" *id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1313; *see CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally

3

speaking, [courts] indulge a 'heavy presumption' that a claim term carries its ordinary
and customary meaning."). In those instances when the claim language "involves little
more than the application of the widely accepted meaning of commonly understood
words," construction is relatively straightforward, and "the ordinary meaning . . . may be
readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314. When the claim terms
have a particular meaning in the field, however, courts "look[ ] to 'those sources
available to the public that show what a person of skill in the art would have understood
disputed claim language to mean.'" *Id.* (quoting *Innova*, 381 F.3d at 1116). "These
sources include the words of the claims themselves, the remainder of the specification,
the prosecution history, and extrinsic evidence concerning relevant scientific principles,
the meaning of technical terms, and the state of the art." *Innova*, 381 F.3d at 1116.

The context in which a term is used, both in the asserted claim as well as in other
claims of the patent, can be valuable and instructive. *Phillips*, 415 F.3d at 1314. In
addition, the patent specification – the text and figures of the patent that precede the
claims – "is always highly relevant to the claim construction analysis. Usually, it is
dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315
(quoting *Vitronics*, 90 F.3d at 1582). With that said, "the claim requirement
presupposes that a patent applicant defines his invention in the claims, not in the
specification." *Johnson & Johnston Associates Inc. v. R.E. Service Co., Inc.*, 285 F.3d
1046, 1052 (Fed. Cir. 2002); *see PSC Computer Products, Inc. v. Foxconn Int'l, Inc.*,
355 F.3d 1353, 1359 (Fed. Cir. 2004) ("the claims of a patent limit the invention, and
specifications cannot be utilized to expand the patent monopoly") (quoting *United States
v. Adams*, 383 U.S. 39, 48–49 (1966)).

Although courts may consult extrinsic evidence such as "expert and inventor testimony, dictionaries, and learned treatises," such evidence is "less significant than the intrinsic record," i.e., the specification and prosecution history, and courts must be wary not to use extrinsic evidence to override the meaning of the claim terms demonstrated by the intrinsic evidence. *Phillips*, 415 F.3d at 1317–19 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). That is, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

In short, a court must construe the claim terms as they would be viewed by "the ordinary artisan after reading the entire patent." *Id.* at 1321. This is important in order to respect the public notice function of patents:

> The patent system is based on the proposition that claims cover only the invented subject matter. As the Supreme Court has stated, "[i]t seems to us that nothing can be more just and fair, both to the patentee and the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent."

*Id.* (quoting *Merrill v. Yeomans*, 94 U.S. 568, 573–74 (1876)).

## III.    ANALYSIS

### A.    <u>POSITA</u>

Patent claims are to be construed through the eyes of a person of ordinary skill in the art ("POSITA") at the time of the invention. *Id.* at 1313. The parties agree that a POSITA in this case is "a person with a high school degree or equivalent experience and approximately six months of experience in using or designing muscle therapy devices." Docket No. 114 at 9; Docket No. 115 at 7 ("Thrival does not object to this characterization of the POSITA for the '416 Patent.").

B.  <u>Disputed Claim Terms</u>

### 1.  *Square Pyramidal Bodies*

"Square pyramidal bodies" appears in claims 1, 8, and 10 of the '416 Patent.

'416 Patent col. 7, ll. 5–12, 41–42; col. 8, ll. 16–25.  The term refers to elements of the

"top unit" of the device, *id.* col. 7, ll. 5–9, as opposed to the "base unit," *id.* col. 7, ll. 10–

12, or the "sub-base unit."  *Id.* col. 5, ll. 35–58.  Pso-Rite argues that this term should be

defined as "pyramid-shaped lobes with base edges equal in length."  Docket No. 114 at

9.  Thrival maintains that no construction is necessary because both a lay juror and a

POSITA are likely to understand the term.  Docket No. 115 at 8.  Alternatively, Thrival

asserts that the term should be construed as "bodies of a volumetric shape, generally

consisting of a base with four sides of approximately equal length and faces that rise

from the base and meet at a point or ridge."  *Id.*

A district court need not construe every claim term challenged by a party.  *Finjan,*

*Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206–07 (Fed. Cir. 2010).  Where the

plain and ordinary meaning of the claim term resolves the parties' dispute, a court may

properly refuse to employ an alternative construction.  *Id.*; *Water Tech., LLC v. Kokido*

*Dev. Ltd.*, 2019 WL 1227714, at *1 (E.D. Mo. Mar. 15, 2019) ("if giving the language of

the term its plain, ordinary meaning resolves the parties' dispute, a court need not

engage in claim construction merely to accommodate one party's semantic preference

for the use of a particular word or phrase" (citing *O2 Micro Int'l Ltd. v. Beyond*

*Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008)).  However, a court's

determination that a claim term needs no construction "may be inadequate when a term

has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning

does not resolve the parties' dispute."  *O2 Micro Int'l*, 521 F.3d at 1361.

Courts have an obligation "to ensure that questions of the scope of the patent claims are not left to the jury." *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009); *O2 Micro Int'l*, 521 F.3d at 1362 ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").  "In order to fulfill this obligation, the court must see to it that disputes concerning the scope of the patent claims are fully resolved."  *Every Penny Counts*, 563 F.3d at 1383; *see also GoPro, Inc. v. C&A Mktg., Inc.*, 2017 WL 3131449, at *4 (N.D. Cal. July 24, 2017) ("since the parties present a fundamental dispute regarding the proper scope of the claim as it relates to this term, failing to construe this term could result in the parties making claim construction arguments before the jury").

Here, the Court finds that the parties' dispute regarding the meaning of "square pyramidal bodies" goes to the scope of the claims in the '416 Patent.  Pso-Rite maintains that the '416 Patent is limited to a neuromuscular therapy device that includes pyramidal bodies whose base sides are equal in length, whereas Thrival maintains that the patent also covers therapy devices with pyramidal bodies whose base sides are approximately equal in length.  Docket No. 114 at 9; Docket No. 115 at 8.  To resolve the parties' dispute, a jury would be required to construe the terms of the patent. Therefore, the Court will construe the term "square pyramidal bodies."  *Markman*, 517 U.S. at 384 (claim construction is "a question of law, to be determined by the court").

Pso-Rite asserts that the '416 Patent elsewhere refers to two pyramidal bodies placed adjacent to each other as a "bi-lobed unit, with each of the lobes formed by the pyramidal bodies 136 with top[ ] peaks 139, which maintains the two lobes in fixed spatial relationship."  Docket No. 114 at 10 (citing '416 patent at col. 4, ll. 48–51).  Pso-

Rite claims that using the word "lobe" to describe the pyramidal bodies is consistent with the patent's description. *Id.* Thrival acknowledges that the specification uses the term "lobe" to describe an embodiment of the patent. Docket No. 115 at 8–9. However, Thrival maintains that only one specification in the patent uses the term lobe in reference to the pyramidal bodies and that Pso-Rite's substitution of the word "bodies" with "lobes" would impermissibly import a limitation from the specification into the patent. *Id.* The Court agrees that the term "bodies" may encompass more shapes than the term "lobes" and will not define the term "square pyramidal bodies" as lobes. *Bayer AG. v. Biovail Corp.*, 279 F.3d 1340, 1348 (Fed. Cir. 2002) ("a court may not read into a claim a limitation from a preferred embodiment, if that limitation is not present in the claim itself").

Next, the parties dispute whether a "square pyramidal body" must have a base whose sides are equal in length. Pso-Rite argues that a square is a geometric shape defined as a rectangle with four equal sides. Docket No. 114 at 10. It claims that, while a rectangle may have sides of "approximately equal length," a square cannot. *Id.* Moreover, Pso-Rite maintains that a POSITA would recognize the distinction between rectangles and squares. Docket No. 116 at 4.

Thrival responds that there are two indications that the '416 Patent uses the term "square" to refer to shapes whose sides are approximately equal in length. Docket No. 115 at 9–12. First. Thrival points to the figures in the specification. *Id.* at 9. Noting that "'patent drawings are highly relevant in construing' claim limitations," *id.* (quoting *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1153 (Fed. Cir. 1997)), Thrival maintains that none of the figures in the '416 Patent depict bodies with perfectly square

bases.  *Id.*  It asserts that "none of the referenced bodies depicted in the patent are

perfect 'square pyramids' from a geometric understanding, but rather shapes that

loosely appear related to, or similar to, such volumetric shapes."  *Id.* at 9–10.  At the

hearing, Thrival relied on Figure 4 to demonstrate that the base of the "square

pyramidal bodies" do not have to be perfectly square.  Docket No. 130 at 9:14–23.

Figure 4 illustrates "a top plan view of an embodiment of the invention, in an

unassembled state."  '416 Patent col. 2, ll. 17–18.



FIG.4

*Id.* at 7.  The specification states that, "in one example[, the] top unit is a bi-lobed unit,

with each of the lobes formed by the pyramidal bodies with top peaks, which maintains

the two lobes in fixed spatial relationship."  *Id.* col. 4, ll. 48–51 (internal citations

omitted).  At the hearing, Thrival stated that the width of the top unit in Figure 4 is 3.7

centimeters but that the length of the top unit, which includes both pyramidal bodies,

was 6.8 centimeters.[3]  Docket No. 130 at 9:14–23.  Because square bases would

require a base length of at least 7.4 centimeters, Thrival maintains that Figure 4 shows

that "square pyramidal bodies" do not need perfectly square bases.  *Id.*

Thrival's argument that depictions of the pyramidal base in the figures do not

show perfectly square bases is not persuasive.  Figures where the sides of the base do

not appear to be equal are drawn in a three-dimensional perspective, with the near side

longer than the foreshortened far side.  Figure 1, which "illustrates a top plan view of

three units of an embodiment of the invention," is an example of such foreshortening.

'416 Patent col. 2, ll. 11–12.



*Id.* at 4.  The specification's description of Figure 1 states that

> units 10, 20, 30 of this embodiment can be used individually or together, and,
> when used together, can be used in multiples of the same size (such as two units
> 10) or in different sizes (such as a unit 10 used together with a unit 30).  The flat
> lower surface provided by the rectangular base edges (or, in the particularly

---

[3] Statements made by counsel for Thrival at the hearing indicate that she had
used a ruler to measure these lengths based on a copy of the '416 Patent.  *See* Docket
No. 130 at 9:14–23.

illustrated embodiment, the square base edges) is conducive to the unit being
placed on a flat surface, such as on a floor or against a wall.

*Id.* cols. 3–4, ll. 66–6.  This language indicates that the bases of the pyramidal bodies in

Figure 1 are square.  Figure 2, which "illustrates a bottom perspective view of the FIG. 1

embodiment units," further demonstrates that these pyramidal bodies have square

bases.  *Id.* col. 2, ll. 13–14.



*Id.* at 5.  Thus, with a top down perspective, which has no foreshortening, the figure

shows the base of the top unit having sides of equal length.

Thrival also points to Figure 4 as depicting pyramidal bodies as not having base

sides of equal length.  *See id.* at 7.  Figure 4 does not clearly illustrate Thrival's

argument.  Figure 4 is a top down view of an embodiment of the unassembled device

that has two pyramidal bodies, as shown in the sideview illustration, Figure 5b.  *Id.* at 4,

6.  It is not apparent from Figure 4 how the two pyramidal bodies are positioned on the base unit.  Figure 5b suggests that the "central valley 138" separates the pyramidal bases.



FIG.5b

*Id.* at 6.  Figure 5b is not inconsistent with square pyramidal bases being positioned on the base unit and therefore Figure 5b does not support Thrival's argument.

Next, Thrival cites *Water Tech.*, 2019 WL 1227714, at *15–21, for the proposition that the '416 Patent's use of the term "square pyramidal bodies," rather than "square pyramid bodies," demonstrates that the base of the pyramids need only be approximately square.  Docket No. 115 at 11.  The patent at issue in *Water Tech.* described a pool cleaning tool.  *See Water Tech.*, 2019 WL 1227714, at *4.  Claim 1 of the patent stated that the tool had a "toroidal body."  *Id.*  The court explained that a toroid is a three-dimensional shape formed by rotating a two-dimensional shape about an axis.  *Id.* at *5.  The parties disputed whether the phrase "toroidal body" should be construed as "a body that is shaped like a toroid and 360° symmetrical" or "a body

12

having a shape generally related to a toroid." *Id.* After examining the figures in the patent, the court concluded that "the claim, specification, and prosecution history[ ] supports a conclusion that the inventor envisioned a curved, compact body with a hole through it for a handle, but not a perfect toroid." *Id.* at *7. The court reached this conclusion, in part, because, "if Figures 2 and 9 reflect what the inventor and examiner viewed as a toroidal body, then Kokido's construction invoking 360-degree symmetry cannot be correct." *Id.* Although the court indicated that there was "minimal value in the extrinsic evidence presented on this issue," the court noted that certain dictionaries state that the "suffix '-al' generally means 'of, relating to, or characterized by.'" *Id.* at *7–8 (citing *Civix-DDI, LLC v. Cellco Partnership*, 2005 WL 831307, at *4 (N.D. Ill. Apr. 6, 2005) (citing Webster's 3rd New Int'l Dictionary)). The court defined "toroidal body" to mean "a body having a shape related to a toroid." *Id.* at *8. Thrival maintains that, as in *Water Tech.*, its use of the suffix "-al" in "square pyramidal bodies" does not require the base to be a perfect square or a perfect pyramid. Docket No. 115 at 8.

*Water Tech.* is distinguishable for several reasons. First, the figures relied on by the court in *Water Tech.* were stronger evidence that the term "toroidal bodies" did not refer to a perfect toroid. As the court noted, both claim 1 and the figures described a pool cleaning tool that had a handle "integrally formed from an upper portion of the toroidal body and an opening through the toroidal body." *Water Tech.*, 2019 WL 1227714, at *4. Such a handle would have necessarily broken the symmetry required of a perfect toroid. *Id.* at *4–8. Here, there is no indication that a pyramidal body with a base whose sides are equal in length would conflict with any other claim terms. Next, in *Water Tech.*, the parties disputed the significance of the term "toroidal body," whereas

13

the parties' dispute in this case does not center on Thrival's use of the term "pyramidal."
*See Water Tech.*, 2019 WL 1227714, at *4. Instead, the parties dispute whether the
term "square" as a descriptor of the pyramidal bodies requires base sides of equal
length. *See* Docket No. 114 at 10; Docket No. 115 at 12. Finally, the drafters of the
patent in *Water Tech*. were faced with the challenge of describing the complex shape of
the pool cleaning device, whereas here the top unit does not have a complex shape.
Pyramidal bodies whose bases are not perfect squares can be described as rectangular
pyramidal bodies. In fact, the specification of the '416 Patent specifically acknowledges
the distinction between rectangular and square bases. *See* '416 Patent col. 4, ll. 3–6
("The flat lower surface provided by the rectangular base edges (or, in the particularly
illustrated embodiment, the square base edges) is conducive to the unit being placed on
a flat surface"). Nevertheless, claim 1 of the '416 Patent states that the neuromuscular
therapy device includes "a top unit comprising a pair of square pyramidal bodies
separated by a central valley." '416 Patent col. 7, ll. 6–7.

As both parties acknowledge, a square is a rectangle whose sides are equal in
length. Docket No. 114 at 10 (*Square*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/square (Aug. 9, 2024) (noun, a "rectangle with all four sides
equal"); Docket No. 115 at 9 (citing *Square*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/square (Oct. 30, 2024) (adjective, "having four equal sides and
four right angles"). The term "square pyramidal bodies" requires the base shape to be a
square, which requires that the sides of the base be equal in length. Accordingly, the
Court will construe the term "square pyramidal bodies," '416 Patent col. 7, ll. 5–12, 41–

42; col. 8, ll. 16–25, as "pyramidal bodies with the sides of the base being equal in length."

### 2.  A Top Peak with Vertices That Are Smoothly Radiused

The term "top peak with vertices that are smoothly radiused" appears in claims 1, 8, and 10 of the '416 Patent.  '416 Patent col. 7, ll. 8–9, 39–40; col. 8, l. 21.  Pso-Rite maintains that the term is indefinite.  Docket No. 114 at 11.

"A lack of definiteness renders invalid 'the patent or any claim in suit.'"  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 902 (2014) (quoting 35 U.S.C. § 282(b)). A claim term is indefinite if it fails, "read in light of the specification delineating the patent,  . . . to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Id.* at 901; *Takeda Pharm. Co. Ltd. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1366 (Fed. Cir. 2014) ("Whether a claim is invalid for indefiniteness requires a determination whether those skilled in the art would understand what is claimed when the claim is read in light of the specification." (citation omitted)).  The key question is whether the intrinsic evidence provides "a general guideline and examples sufficient to enable a person of ordinary skill in the art to determine" the scope of the claims.  *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1335 (Fed. Cir. 2010).  "The internal coherence and context assessment of the patent, and whether it conveys claim meaning with reasonable certainty, are questions of law."  *Sonix Tech. Co. Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017) (citation omitted).  In "the face of an allegation of indefiniteness, general principles of claim construction apply."  *Sci. Applications Int'l Corp. v. United States*, 169 Fed. Cl. 643, 679 (2024) (quoting *Enzo Biochem*, 599 F.3d at 1332).  "An accused infringer must [ ] demonstrate by clear and convincing evidence" that a claim term is indefinite.  *Haemonetics Corp. v. Baxter*

*Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010) (citing *Halliburton Energy Servs.,
Inc. v. M-I LLC*, 514 F.3d 1244, 1249–50 (Fed. Cir. 2008)); *see also Impax Labs., Inc. v.
Aventis Pharm., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008) ("An issued patent enjoys a
presumption of validity[, and] a party challenging patent validity has the burden to prove
its case with clear and convincing evidence.").

Claim 1 of the '416 Patent describes a neuromuscular therapy device with "a top
unit comprising a pair of square pyramidal bodies separated by a central valley, wherein
each of the pair of square pyramidal bodies comprises a top peak with vertices that are
smoothly radiused." '416 Patent col. 7, ll. 6–9. Pso-Rite claims that the term "a top
peak with vertices that are smoothly radiused" is indefinite because a single, top peak
cannot have multiple vertices. Docket No. 114 at 11 ("a 'top peak with vertices' is a
geometric impossibility"). Thrival responds that Pso-Rite is attempting to inject
ambiguity into the patent by considering only a piece of the claim limitation without
considering the full limitation. Docket No. 115 at 13. Thrival maintains that the full claim
limitation is that "each of the pair of square pyramidal bodies comprises a top peak with
vertices that are smoothly radiused." *Id.* (quoting '416 Patent col. 7, ll. 6–9). The Court
agrees that the full claim limitation needs to be taken into consideration. *See Quantum
Corp. v. Rodime, PLC*, 65 F.3d 1577, 1581 (Fed. Cir. 1995) ("The major flaw in
Rodime's argument is that it focuses solely on the term '600 tpi' instead of the claim
limitation as a whole, in context. Even if '600 tpi' means 'approximately 600 tpi,' as
Rodime argues, it is unnecessary to read in an implicit range when interpreting 'at least
600 tpi' because this limitation as a whole already expressly represents an open-ended
range, i.e. 600 tpi and up."); *Advanced Magnetic Closure, Inc. v. Rome Fastener Corp.*,

2005 WL 1241896, at *3 (S.D.N.Y. May 24, 2005) (while defendants are correct that the
patent "does not state that the magnetic attraction between the magnet and the male
half is increased" defendants improperly "focus on the word increase as it relates to the
phrase magnetic member, instead of the claim limitation as a whole, in context.  The
claim language continues with the explanation as to how the magnetic attraction is able
to be enhanced." (citation omitted)); *cf. Resonate Inc. v. Alteon Websystems, Inc.*, 338
F.3d 1360, 1365 (Fed. Cir. 2003) ("a disputed claim limitation is construed in the context
of other words and limitations in the claim" (citing *Brookhill–Wilk 1, LLC v. Intuitive
Surgical, Inc.*, 334 F.3d 1294, 1295 (Fed. Cir. 2003)).  Pso-Rite has not shown that a
POSITA would read the limitation that "each of the pair of square pyramidal bodies
comprises a top peak with vertices that are smoothly radiused" as containing more than
one limitation, such that the term "a top peak with vertices" should be analyzed
independently from the rest of the limitation.

Determining whether a claim is indefinite "entails a 'delicate balance.'"  *Nautilus*,
572 U.S. at 909 (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535
U.S. 722, 731 (2002)).  "On the one hand, the definiteness requirement must take into
account the inherent limitations of language."  *Id.* (citation omitted).  Moreover, courts
"must bear in mind . . . that patents are not addressed to lawyers, or even to the public
generally, but rather to those skilled in the relevant art."  *Id.* (citation and quotation
omitted).  "At the same time, a patent must be precise enough to afford clear notice of
what is claimed, thereby apprising the public of what is still open to them."  *Id.* (citation,
quotation, and alterations omitted).  Therefore, the Court will consider whether the claim
term "each of the pair of square pyramidal bodies comprises a top peak with vertices

that are smoothly radiused," '416 Patent col. 7, ll. 6–9, provides a person skilled in the relevant art with adequate notice of the scope of the claim or is, instead, indefinite.

Pso-Rite argues that the prepositional phrase "with vertices that are smoothly radiused" refers to the "top peak" of a single square pyramidal body. Docket No. 114 at 11. Because a top peak can only have one vertex, Pso-Rite maintains that the phrase "a top peak with vertices that are smoothly radiused" is a geometric impossibility, and that the claim term is therefore indefinite. *Id.* at 11-12. Pso-Rite notes that the specification refers to a pyramidal body as having "each vertex smoothed off, or radiused," '416 Patent col. 2, ll. 65–67, referring to a pyramidal body with multiple vertices, but the disputed claim term specifies "a top peak" with "vertices."[4] Docket No. 114 at 12. Pso-Rite maintains that, although the ambiguity appears to be the result of a drafting mistake, it would be improper for the Court to fix the mistake through amendment because it "is improper to rewrite claim language to save a patent from impossibility." *Id.* at 12 (quoting *Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*, 2021 WL 1092579, at *2 (D. Del. Mar. 22, 2021) (citing *Chef Am. Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1375 (Fed. Cir. 2004)).

Thrival argues that the appropriate interpretation of the disputed term is that each pyramidal body has a top peak and has all of its vertices smoothly radiused. Docket No. 115 at 13. First, Thrival maintains that, in order for the Court to adopt Pso-Rite's interpretation, such that the phrase "vertices" refers to the single vertex of a top peak, the Court must ignore the claim language that the top unit comprises a "pair of square

---

[4] In its brief, Pso-Rite misquotes the patent. *See* Docket No. 114 at 11–12 ("It never refers to a top peak having multiple vertices. Instead, it refers to the 'pyramidal bodies' as having 'vertices that are smoothed off, or radiused.'").

pyramidal bodies." Docket No. 115 at 13. At the hearing, Thrival contended that, because the claim refers to a pair of pyramidal bodies, there are, in fact, two top peaks that are smoothly radiused and thus two "vertices." Docket No. 130 at 20:15–18.

To support its preferred interpretation, Thrival points to language in the specification to show that all the vertices of the pyramidal bodies are radiused. Docket No. 115 at 15. The specification states that the square pyramidal bodies in the embodiment shown in Figures 4 and 5 have "vertices that are smoothed off, or radiused." '416 Patent col. 4, ll. 38–40 (internal citation omitted); Docket No. 115 at 15. Referring to Figure 1, the specification states that "the four base vertices of [the] base unit, where base edges meet, are each smoothly radiused." '416 Patent col. 3, ll. 4–6 (internal citations omitted); Docket No. 115 at 15. Therefore, Thrival maintains that the "vertices" that are smoothly radiused are all of the vertices of the square pyramidal bodies. *See* Docket No. 115 at 15. Finally, Thrival directs the Court to Figures 4, 5(a), and 5(b). Docket No. 115 at 14.



'416 Patent at 7–9. Thrival maintains that these figures "depict a device with a pair of square pyramidal bodies – each body possessing multiple vertices – base and peak – that are smoothly radiused." Docket No. 115 at 14.

It is true that some embodiments of the device depicted in the specification include examples of square pyramidal bodies that have all of their vertices smoothly radiused, *see, e.g.*, '416 Patent col. 3, ll. 4–9 ("As illustrated in FIG. 1, the four base vertices 12 of base unit 10, where base edges 14 meet, are each smoothly radiused. Top peak 16 is also Smoothly radiused.").  However, when describing these embodiments, the specification explicitly addresses that the base edges of the pyramidal bodies are smoothly radiused.  *Id.*  In a separate sentence, the specification indicates that the top peak is also smoothly radiused.  *Id.*  Given the distinction between the base edges and the top peak in the embodiments and the absence of any reference to the base edges in the claim language, there is no indication that it was the drafters' intent to include a limitation about the base edges of the square pyramidal bodies in the claims at issue.  The Federal Circuit has cautioned that, "[t]o avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so."  *Phillips*, 415 F.3d at 1323.  "[U]pon reading the specification in that context," the Court must consider "whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive."  *Id.*  Thrival has produced no evidence that a POSITA would understand the term "each of the pair of square pyramidal bodies comprises a top peak with vertices that are smoothly radiused" to include the limitation that every vertex must be smoothly radiused.  Based on the different embodiments shown in the specification, the Court finds no support for the proposition that the patentee intended, or that a

POSITA would believe, that the embodiments in the specification should be coextensive with the claims.  Therefore, the Court will not import the limitation in the specification that all the vertices of the square pyramidal bodies must be smoothly radiused into the claims at issue, *Bayer AG.*, 279 F.3d at 1348, and will reject Thrival's proposed construction of this term.

Instead, the Court agrees with Pso-Rite that there is a grammatical mismatch between the claim language's reference to a top peak and multiple vertices.  Generally, the word "each" is used to refer to individual things in a group of two or more.  Therefore, the phrase "each of the pair of square pyramidal bodies" instructs the POSITA to consider individually the single square pyramidal bodies.  '416 Patent col. 7, ll. 6–8.  Moreover, the verb "comprises" is singular, again indicating that the claim limitation is discussing a single square pyramidal body.  *Id.* col. 7, l. 8.  The claim then further specifies that the singular square pyramidal body constitutes "*a* top peak," which is again singular.  *Id.* (emphasis added).  However, the claim refers to this single top peak as having "vertices," plural, that "are" smoothly radiused.  *Id.* col. 7, ll. 8–9.  Pso-Rite argues that, because a top peak cannot have multiple vertices, the claim language requires the impossible and that claims 1, 8, and 10 are therefore indefinite.  Docket No. 114 at 12.  But Pso-Rite acknowledges both in its briefing and at the hearing that the use of plural vertices to refer to a single top peak appears to be "a drafting mistake."  *Id.* at 5, 12; Docket No. 130 at 22:23–23:11.

"It is well-settled law that, in a patent infringement suit, a district court may correct an obvious error in a patent claim."  *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011) (citing *I.T.S. Rubber Co. v. Essex Rubber*

*Co.*, 272 U.S. 429, 442 (1926)).  "Correction is appropriate only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."  *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022) (citation and quotation omitted).  The error must be "evident from the face of the patent," *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005), and the determination "must be made from the point of view of one skilled in the art."  *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009).  "In deciding whether a particular correction is appropriate, the court 'must consider how a potential correction would impact the scope of a claim and if the inventor is entitled to the resulting claim scope based on the written description of the patent.'" *Pavo Sols.*, 35 F.4th at 1373 (quoting *CBT Flint*, 654 F.3d at 1359).

The Court finds that the mistake is evident from the face of the patent.  The disputed claim language discusses a singular top peak, but references the top peak as having multiple vertices.  '416 Patent col. 7, ll. 6–9.  As Pso-Rite notes, this language describes a geometric impossibility.  Docket No. 114 at 11-12.

Next, in light of the claim language and the specification, the Court finds that a POSITA would understand that the phrase "each of the pair of square pyramidal bodies comprises a top peak with vertices that are smoothly radiused," *id.* col. 7, ll. 6–9, to require that the vertex of the top peak of the two square pyramidal bodies be smoothly radiused.  There is no indication that a POSITA, who has a high school degree and approximately six months of experience in using or designing muscle therapy devices, would be unable to recognize the obvious drafting mistake, or that the field of muscle

therapy device design is of such a technical nature that the reference to multiple vertices would leave a POSITA unable to ascertain what the patent claims as the shape of the top peak of the square pyramidal bodies.  Moreover, even if the claim language was ambiguous, the Court must also consider the specification.  *Pavo Sols.*, 35 F.4th at 1373.  Figures 5b, 11, and 12 do not depict a geometric impossibility.  '416 Patent at 6, 11, 12.  Instead, these figures depict an assembled top unit with two pyramidal bodies, each of which has a smoothly radiused top peak.  *Id.*  Figures 1 and 3 show individual embodiments of a single square pyramidal body.  *Id.* at 1, 3.  These figures depict a square pyramidal body that has a single top peak that curves in a rounded fashion towards the square base of the pyramid.  *Id.*  Finally, the specification describes the square pyramidal body in Figure 1 as having "four base vertices" that "are each smoothly radiused" and states that the "[t]op peak 16 is also smoothly radiused."  '416 Patent col. 3, ll. 4–6.  Thus, the specification equates a top peak to a single vertex and identifies the top peak as the geometric feature that is smoothly radiused.  Based on the claim language and the guidance provided in the specification, the Court finds that the correction to claim language to require "a vertex," rather than "vertices", that is smoothly radiused is not subject to reasonable debate.  Finally, neither party has referred to the prosecution history as including anything to the contrary.  *See* Docket No. 114; Docket No. 115.  Accordingly, the Court finds that there is no indication that the patent prosecution history suggests a different interpretation of the disputed claim term.

Pso-Rite does not challenge that correcting the word "vertices" to "vertex" would be the appropriate correction.  *See* Docket No. 114 at 11-12.  Instead, it cites *Koki Holdings*, 2021 WL 1092579, at *2, for the proposition that it "is improper to rewrite

claim language to save a patent from impossibility." *Id.* at 12.  However, this case is

distinguishable from *Koki Holdings*.  In *Koki Holdings*, the court found that "[c]laims 2, 3,

and 4 unambiguously require the fluid connection of a solid and thus a fluid exchange

between that solid and an open chamber.  Nothing in the record explains how this is

possible." *Koki Holdings*, 2021 WL 1092579, at *2.  The court explained that the "clear

and unambiguous language of claim 2 (from which claims 3 and 4 depend) requires the

impossible – 'a trigger valve exterior frame to which the main valve control channel is

fluidly connected.'  A trigger valve exterior frame is indisputably a solid.  A solid is not a

fluid and therefore cannot be fluidly connected to anything." *Id.* at *1 (quoting U.S.

Patent No. 7,156,012).  Thus, the language of the claims at issue in *Koki Holdings*

unambiguously required the impossible, and the specification provided no guidance as

to how the allegedly impossible claim limitation could be achieved. *Id.*  Instead, the

patentee attempted to provide expert testimony regarding how the limitation was

possible, which the court did not find persuasive. *Id.*  Although the court acknowledged

that the claim limitation "could plausibly be read to mean that a fluid connection exists

between the trigger *valve* (which consists in part of a hallow area within the exterior

frame) and main control valve channel," the court held that the limitation was "inherently

unclear." *Id.* at *2.  Therefore, although the court did not discuss the ambiguity in terms

of a drafting mistake, it is obvious from the court's reasoning that any proposed

correction would have been subject to reasonable debate.  Here, the claim term "a top

peak with vertices that are smoothly radiused," when read in light of the specification,

provides sufficient guidance that a POSITA would understand that the top peak

constitutes a single vertex that is smoothly radiused. *See* '416 Patent col. 7, ll. 8–9, 39–

40; col. 8, l. 21.  Therefore, unlike the patent at issue in *Koki Holdings*, the '416 Patent resolves any ambiguity caused by the drafting error, and there is no reasonable debate as to the scope of the claim limitation.

At the hearing, Pso-Rite argued that there was a distinction between typographical errors or misspellings, which Pso-Rite acknowledged a court may correct, from grammatical errors, which it claims the court cannot correct.  Docket No. 130 at 22:23-23:11.  However, Pso-Rite provides no support for this distinction.  Instead, as discussed above, "[i]t is well-settled law that, in a patent infringement suit, a district court may correct an obvious error in a patent claim."  *CBT Flint*, 654 F.3d at 1358.  A court's ability to correct such errors depends on whether the error is obvious from the face of the patent, the correction is not subject to reasonable debate, and the prosecution history does not suggest a different interpretation.  *Pavo Sols.*, 35 F.4th at 1373.  Here, correcting the '416 Patent's erroneous use of the word vertices to refer to a single top peak would fix an error that is clear on the face of the patent, is not subject to reasonable debate, and is not contradicted by the patent prosecution history. Therefore, the Court finds that claims 1, 8, and 10 are not indefinite.  Instead, the claim term "each of the pair of square pyramidal bodies comprises a top peak with vertices that are smoothly radiused," *id*. col. 7, ll. 6–9, refers to two square pyramidal bodies, each of which has a top peak that is smoothly radiused.  The Court will therefore correct the disputed claim language to be that "each of the pair of square pyramidal bodies comprises a top peak with [a] vert[ex] that [is] smoothly radiused."  *Id.*

### 3.  Recessed Platform

The term "recessed platform" appears in claims 1, 8, and 10 of the '416 Patent. *Id.* col. 7, ll. 10–11; col. 8, ll. 2–3, 22–24.  Claim 1 describes a "neuromuscular therapy

device" which includes "a base unit comprising a recessed platform, wherein the

recessed platform corresponds and is configured to receive an entire bottom perimeter

of the top unit." *Id.* col. 7, ll. 10–12. Claim 8 refers to a "method of neuromuscular

therapy" that involves

> placing a neuromuscular therapy device against a flat surface, the
> neuromuscular therapy device comprising a pair of square pyramidal
> bodies separated by a central valley, wherein each of the pair of square
> pyramidal bodies comprises a top peak with vertices that are smoothly
> radiused;
> positioning a user on the neuromuscular therapy device to exert pressure
> against a therapeutic anatomical target of the user; and
> disposing the neuromuscular therapy device onto **a recessed platform** of
> a base unit.
> wherein the recessed platform corresponds and is configured to receive
> an entire bottom perimeter of the neuromuscular therapy device . . . .

*Id.* col. 7–8, ll. 33–5 (emphasis added). Claim 10 refers to a "neuromuscular

therapy device" comprising:

> user on the neuromuscular therapy device to exert pressure against a
> therapeutic applying means for applying anatomical pressure to a user,
> the applying means comprising a pair of square pyramidal bodies
> separated by a central valley, wherein each of the pair of square
> pyramidal bodies comprises a top peak with vertices that are smoothly
> radiused; and
> base means comprising a recessed platform for receiving an entire bottom
> perimeter of the applying means, wherein the **recessed platform**
> corresponds to the entire bottom perimeter of the applying means.

*Id.* col. 8, ll. 16–25.

Pso-Rite argues that the term "recessed platform" should be interpreted as a "flat

indentation." Docket No. 114 at 12. Pso-Rite claims that its interpretation is consistent

with the patent's specification. *Id.* at 13. Specifically, Pso-Rite references the

specification's description of Figures 4 and 5. *Id.* The description of these figures

states that the "[b]ase unit is generally characterized by a rectangular profile in top plan

view with end edges and side edges.  A top central portion of [the] base unit[ ] may be hollowed, providing a seat within which [the] top unit may be placed, as is particularly illustrated in FIG. 5."  '416 Patent col. 4, ll. 25–30 (internal citations omitted).  Pso-Rite asserts that the patents use of the term "hollowed" "requires that the 'recessed platform' have a degree of depth."  Docket No. 114 at 13–14.  "Hence, the recessed platform (or top central portion 126) is some form of a depression, dent, or indentation by which the base unit sits therein."  *Id.* at 14.

At the hearing, Pso-Rite argued that the specification's use of the word "seat" indicates that the indentation creating a "recessed platform" must be flat because seats are generally flat and do not have projections on the surface of the seat.  Docket No. 130 at 28:20–29:4.  Pso-Rite states that the indentation must also be flat because claim 8 requires the entire neuromuscular therapy device to be placed on "a flat surface."  Docket No. 114 at 14.  Finally, Pso-Rite explains that the term "recessed platform" requires a flat indentation because a platform is defined as "a flat horizontal surface that is usually higher than the adjoining area."  *Id.* (quoting *Platform*, Mirriam-Webster, https://www.merriam-webster.com/dictionary/platform (Aug. 9, 2024)).

Thrival responds that no construction of the term "recessed platform" is necessary because both a lay juror and a POSITA would be able to understand what is meant by the term "recessed platform."  Docket No. 115 at 17.  Thrival highlights the specification's summary, *id.*, which states that the "base unit include[s] a hollowed top central portion configured to provide a seat within which the top unit is secured."  '416 Patent col. 1, ll. 47–49.  Thrival maintains that the term "recessed platform" is more effective at communicating the concept of a base with a hollowed central portion used to

secure the top unit than a "flat indentation."  Docket No. 115 at 17.  Thrival believes that

both a POSITA and a lay juror would be familiar with the ordinary meaning of the term

"recessed," such as when the term is used in the phrase "recessed lighting," which is

consistent with how the '416 Patent uses the term.  *Id.*  As to Pso-Rite's argument that a

recessed platform requires a flat surface, Thrival argues that the flat surface referenced

in claim 8 does not refer to the interior surface of the recessed platform, but instead

refers to an external flat surface on which the entire neuromuscular therapy device is

placed.  *Id.* at 14.

The Court agrees with Thrival that Pso-Rite's argument that the indentation must

be flat because claim 8 requires the device to be placed on a flat surface is not

persuasive.  The claim term at issue describes the interface between the top unit and

the base unit of the device.  '416 Patent col. 7, ll. 10–11; col. 8, ll. 2–3, 22–24.  It does

not describe the interface between the base unit and the flat surface on which the

device would be placed as part of the method described in claim 8.  *See id.* col. 7–8, ll.

33–9.  Therefore, the Court finds that the patent's reference to a flat surface in claim 8

does not indicate that the recessed platform of the base unit must be flat.

Moreover, to the extent that Pso-Rite relies on the figures in the patent for the

proposition that the base unit must be flat because no figure shows a base unit with a

protrusion, Pso-Rite is impermissibly seeking to impose a limitation suggested by the

patent's figures, each of which is an embodiment, into the claims of the patent.  *Bayer*

*AG.*, 279 F.3d at 1348 ("a court may not read into a claim a limitation from a preferred

embodiment, if that limitation is not present in the claim itself").  As such, the Court will

not construe the term "recessed platform" to require a "flat" indentation.

Furthermore, the Court agrees that there is no reason to construe the term "recessed platform" as an "indentation." "Claim terms are generally given their plain-and-ordinary meaning." *RECOG IP LLC v. Sephora USA, Inc.*, 2024 WL 1252373, at *1 (W.D. Tex. Mar. 22, 2024) (citing *Phillips*, 415 F.3d at 1312). The Court finds that "recessed platform" has a "widely accepted meaning of commonly understood words," *Andritz Inc. v. Cortex N. Am. Corp.*, 2021 WL 3268306, at *2 (D. Or. July 30, 2021) (citation omitted), which would not be made more apparent by the Court using the term "indentation" as a substitute for "recessed platform." In addition, Pso-Rite has not shown that a POSITA would have an understanding of a "recessed platform" that is different from the term's ordinary meaning or that a POSITA would understand the term "recessed platform" to be synonymous with an indentation. Therefore, the Court finds that no construction of the term "recessed platform" is necessary.

### C. Material Science and Anatomical Terms

In addition to the claim terms discussed above, Thrival also seeks construction of one term related to the material the pyramidal bodies are made of and three anatomical terms regarding muscle groups to which the device could be applied. *See* Docket No. 113 at 2–5. Pso-Rite does not believe that construction of these terms is necessary. *Id.*

#### 1. Thermoplastic Elastomer

Dependent claim 3 states that the "neuromuscular therapy device" described in claim 1 includes a top unit "made of a **thermoplastic elastomer**." '416 Patent col. 7, ll. 15–16. Claim 10 includes a "neuromuscular therapy device, comprising: applying means for applying anatomical pressure to a user." *Id.* col. 8, ll. 15–17, 28–30. Dependent claim 12 states that the "applying means" of the "neuromuscular therapy device according to claim 10" is "made of a **thermoplastic elastomer**." *Id.* ll. 28–30.

29

Thrival asks the Court to construe the term thermoplastic elastomer as a "material consisting of a physical mix of polymers, which include at least one plastic and at least one rubber."  Docket No. 115 at 20.

Pso-Rite does not dispute the accuracy of Thrival's definition.  Docket No. 114 at 14; Docket No. 116 at 8–9.  However, Pso-Rite claims that the term thermoplastic elastomer is "self-defining" and that "[t]here is no ambiguity that necessitates judicial clarification."  Docket No. 116 at 8.  While Pso-Rite agrees that "it is important to ensure that jurors understand the technical aspects of a case," Pso-Rite claims that "over-explaining or redefining established terms can lead to misunderstandings."  *Id.* at 9.  Pso-Rite argues that Thrival's definition "will complicate [the jurors'] understanding rather than enhance it."  *Id.*

Thrival responds that, "although it is true that claim construction is most often conducted to resolve 'disputed meanings' of terms, that is not its exclusive function and construction may be warranted to resolve the 'technical scope' of terms in order 'to clarify and when necessary to explain what the patentee covered by the claims.'"  Docket No. 115 at 19 (quoting *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).  Thrival maintains that, because "thermoplastic elastomer" is a "technical term," the Court should construe the term "for the aid of lay jurors."  *Id.*

"When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *O2 Micro Int'l*, 521 F.3d at 1362; *Every Penny Counts*, 563 F.3d at 1383 ("the court must see to it that disputes concerning the scope of the patent claims are fully resolved").  However, a district court need not construe every claim term challenged by a party.  *Finjan,* 626 F.3d at 1206–07.  At the hearing,

Thrival argued that defining the term "thermoplastic elastomer" would help define the scope of claims 3 and 12.  Docket No. 130 at 30:16–19.  While it may be helpful for lay jurors to understand what is meant by "thermoplastic elastomer," Thrival has not presented a dispute over the scope of the term and has not demonstrated that construction is "necessary to explain what the patentee covered by the claims," *United States Surgical*, 103 F.3d at 1568, given that Pso-Rite does not contest Thrival's definition of the term.  Docket No. 116 at 8–9.

Moreover, Thrival has not demonstrated that a POSITA would understand the term "thermoplastic elastomer" better than a lay juror or that a POSITA would define the term as Thrival claims.  *Phillips*, 415 F.3d at 1313 (claim terms are given "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention").  The parties agree that a POSITA is "a person with a high school degree or equivalent experience and approximately six months of experience in using or designing muscle therapy devices."  Docket No. 114 at 9; Docket No. 115 at 7.  At the hearing, Thrival acknowledged that the term "thermoplastic elastomer" would not "inherently be a [term] that one skilled in the art would know."  Docket No. 130 at 31:20–22.  Instead, Thrival maintains that a POSITA would work with a manufacturer or other material scientist to develop their product and that the manufacturer would be aware of the term's meaning.  *Id.* at 30:16–31:22.  Thrival provides no support for the proposition that the Court must interpret the terms of the patent in light of what an expert in a particular field would understand them to be when a POSITA could consult that expert to aid in interpreting the claims of a patent.

Because Thrival has failed to demonstrate that there is a dispute over the scope
of claims 3 and 12 based on the meaning of the term "thermoplastic elastomer," and
because Thrival has not shown that a POSITA would give the term the construction
Thrival proposes, the Court will deny Thrival's request to construe the term
"thermoplastic elastomer" pursuant to *Markman*, 517 U.S. 370.  *Water Tech*, 2019 WL
1227714, at *1 ("a court need not engage in claim construction merely to accommodate
one party's semantic preference for the use of a particular word or phrase").  The Court
agrees, however, that the term "thermoplastic elastomer" could be beyond the ken of an
ordinary juror, and therefore it may be appropriate for the Court to provide a jury
instruction regarding the definition of the term, assuming that trial witnesses have not
already clarified the term's meaning.  Accordingly, if the need arises during the trial, the
parties may submit a proposed jury instruction regarding the meaning of the term
"thermoplastic elastomer."

### 2. Anatomical Terms

Claim 8 of the '416 Patent describes a method of neuromuscular therapy where a
neuromuscular therapy device is placed against a flat surface, and a user is positioned
"on the neuromuscular therapy device to exert pressure against a therapeutic
anatomical target of the user," "wherein the therapeutic anatomical target comprises at
least one of the **erector spinae group**, **multifidus and short posterior sacroiliac
ligaments** and associated trigger points."  '416 Patent col. 7–8 ll. 33–44, 1–9.  Thrival
asks the Court (1) to construe the term "erector spinae group" to mean "the set of
muscles, known as spinal erectors, which reside as columns along the spinal cord, and
contribute to back straightening and rotation; the erector spinae group includes the
iliocostalis muscle, the longissimus muscle, and the spinalis muscle"; (2) to construe the

term "multifidus ligaments" to mean "the ligaments anatomically located in the hip,
pelvis, and along the joints of the spine, which aid the multifidus muscle in stabilizing
vertebrae along the spinal column"; and (3) to construe the term "short posterior
sacroiliac ligaments" to mean "the ligaments anatomically located in the hip and pelvis,
and which are situated in the deep depression between the sacrum and ilium, consisting
of numerous fasciculi, which pass horizontally between the bones thereto."  Docket No.
115 at 22.

Pso-Rite argues that none of these terms should be construed by the Court.
Docket No. 114 at 15–19.  Pso-Rite does not dispute the accuracy of the definitions
provided by Thrival, but it believes that Thrival's definitions of these anatomical terms
"will complicate [the jurors'] understanding rather than enhance it."  Docket No. 116 at
8–9.  Specifically, Pso-Rite states that Thrival's definitions of the anatomical terms do
more harm than good because the definitions add new anatomical terms that would
themselves require definition.  *See* Docket No. 114 at 15–17.  At the hearing, Pso-Rite
argued that, because these terms do not impact claim scope, the Court should give
them their plain and ordinary meaning.  Docket No. 130 at 39:7–13.

The Court finds that Thrival has not presented an issue of claim scope requiring
the Court to construe the terms "erector spinae group," "multifidus ligaments," and "short
posterior sacroiliac ligaments."  Pso-Rite does not challenge the accuracy of Thrival's
definition, Docket No. 116 at 8–9, and neither party believes this claim element is
disputed.  Docket No. 130 at 38:22–23; Docket No. 114 at 15–17.  Furthermore, the
Court finds that Thrival has presented no evidence that a POSITA, who has a high
school education and six months of experience in using or designing muscle therapy

devices, would not only be familiar with the anatomical terms Thrival seeks to define, but would define these terms with similarly obscure anatomical terms. Therefore, the Court will deny Thrival's request to construe the terms "erector spinae group," "multifidus ligaments," and "short posterior sacroiliac ligaments" pursuant to *Markman*, 517 U.S. 370. Instead, assuming that witness testimony does not address the meaning of these terms and that there "is 'a reasonable legal and factual basis' to support such instruction," the parties may submit a proposed jury instruction on the definition of these anatomical terms during trial. *Barker v. McKune*, 2013 WL 100127, at *9 (D. Kan. Jan. 8, 2013) (quoting *United States v. Bryant,* 892 F.2d 1466, 1468 (10th Cir. 1989)).

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the parties' Joint Motion for Determination of Claim Construction [Docket No. 117] is **GRANTED**. It is further

**ORDERED** that the disputed claim terms will be construed as indicated above.

DATED September 29, 2025.

BY THE COURT:

Philip A. Brimmer
Chief United States District Judge

34